[Cite as *In re J.M.*, 2012-Ohio-4705.]

COURT OF APPEALS
FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
|  |  | JUDGES: |
| IN RE: J.M., K.M., M.M. | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. William B. Hoffman, J. |
|  | : | Hon. John W. Wise, J. |
|  | : |  |
|  | : |  |
|  | : | Case No. 2012-CA-23 |
|  | : |  |
|  | : |  |
|  | : | O P I N I O N |

CHARACTER OF PROCEEDING:     Civil appeal from the Fairfield County Court
of Common Pleas, Juvenile Division, Case
Nos. 2010-AB-0081, 2010-AB-0082, 2010-
AB-0083

JUDGMENT:     Affirmed

DATE OF JUDGMENT ENTRY:     October 8, 2012

APPEARANCES:

TREVOR J. INNOCENTI
117 W. Main Street, Ste. 206
Lancaster, OH 43130

JULIE BLAISDELL
239 West Main Street
Lancaster, OH  43130

DAVID SHAVER
647 Hill Road North, Ste. B
Pickerington, OH 43147

BRIAN HERZBERGER
125 W. Waterloo Street
Canal Winchester, OH 43110

*Gwin, P.J.*

{¶1} Appellants the minor children J.M., K.M. and M.M. ["Children"] appeal the March 23, 2012, judgment entry of the Fairfield County Court of Common Pleas, Juvenile Court Division, which placed J.M. in a planned permanent living arrangement with the agency and which terminated adoptive-mother Paula Mayo's[1] parental rights with respect to her minor children M.M. and K.M. and granted permanent custody of the children to appellee, Fairfield County Child Protective Services (hereinafter "FCCPS").

## I. PROCEDURAL HISTORY

{¶2} J.M.'s date of birth is February 18, 1995. K. M.'s date of birth is January 7, 1998. M.M.'s date of birth is March 26, 2001.

{¶3} FCCPS removed the children from their biological mother and their biological father's and assumed custody of the girls. The girls were then placed in the legal custody of their biological maternal grandmother. Tragically, the biological maternal grandmother was killed in an automobile accident. No custody provisions had been made concerning these children prior to the death of the biological maternal grandmother and, therefore, the children were again placed back in the custody of FCCPS. J. M., K. M. and M. M. were eventually placed in the permanent custody of FCCPS and their biological maternal great-aunt, Paula Mayo, adopted them as a single parent after the Agency assumed permanent custody. Paula Mayo is sixty-three years old.

{¶4} A voluntarily agreement for care was signed by Paula Mayo on April 15, 2010, giving FCCPS custody of the children. On June 29, 2010, FCCPS filed dependency/neglect complains on behalf of the children. On July 1, 2010, the children were placed in the temporary shelter custody of FCCPS and on August 17, 2010, the

---

[1] Adoptive mother has appealed in 5th District No. 2012 CA 00018.

children were found to be dependent minors and were placed in the temporary custody of FCCPS. On November 2, 2010, FCCPS filed a motion requesting that J. M. be placed in a planned permanent living arrangement with the Agency and filed motions requesting that K. M. and M. M. be placed in the permanent custody of FCCPS.

{¶5}     The trial on the motions took place on September 13, 2011, December 8, 2011 and concluded on January 31, 2012. The Court heard testimony from Jolyn Pugh, Paula Mayo, Lesley Greenwood, Jasmine Mayo, Deborah Hochbein, Ronda Brown, and Brian Herzberger. The Court noted that on September 6, 2011, Brian Herzberger filed the Guardian Ad Litem's report, which supported the Agency's motion for permanent custody. At the conclusion of all of the testimony, the Court ordered the parties to provide proposed findings of fact and conclusions of law to the Court.

{¶6}     **A. Permanent Custody Trial.**

{¶7}     When FCCPS removed the children in April 2010, they found the upstairs toilet primarily used by the girls "overflowing" with human feces and a knee-high layer of rotting food and garbage in the girls' bedroom. Soiled clothing and underpants belonging to the children were strewn about the room. Gnats were found throughout the home, attracted by the rotting food and garbage. Ms. Mayo also showed signs of hoarding behavior. During her psychological evaluations, Ms. Mayo described her house resembling something from the TV show "Hoarders."

{¶8}     Although the conditions of her home had improved between 2010 and January 2012, the improvement was intermittent. The home met minimal standards for roughly thirty to sixty days, but then regressed. Those standards involved removal of

animal and human feces, disposal of garbage, having pathways in the home that made it accessible for a person with mobility issues and a child with special needs.

{¶9}    There had been significant periods where FCCPS was unable to observe and assess Ms. Mayo's home because Ms. Mayo had cancelled the visits. During an unannounced visit in December 2011, the Agency was only permitted to view Ms. Mayo's living room. While the room met minimal standards, the Agency could not assess the rest of the house during the unannounced visit. Ms. Mayo cancelled the appointment scheduled for the month of January 2012.

{¶10} On January 31, 2012, Ms. Mayo presented current photographs of her home, but the photographs did not include the upstairs area that had previously been filled with garbage and rotting food. No photos were presented of the areas where the children would be living. FCCPS stated that Ms. Mayo did not successfully comply with that aspect of the case plan.

{¶11} FCCPS was also concerned about Ms. Mayo's financial ability to maintain her home. Ms. Mayo had an income of $1,155 per month and a mortgage payment of $1,121 per month. Ms. Mayo had not made a mortgage payment on her home since August 2011. Ms. Mayo was confident that she would receive a mortgage loan modification, but had not established that she would actually obtain the loan modification. Ms. Maya's testified that if the mortgage modification was not granted she would return to work.

{¶12} Ms. Mayo exhibited evidence of confusion, which would significantly affect her ability to parent. Ms. Mayo denied being impaired by medications or having memory problems caused by medications. Throughout the history of the case, however, Ms.

Mayo had difficulty forming sentences, speech delays, confusion about appointments, and difficulty remembering conversations.

{¶13} Ms. Mayo missed an appointment with her psychologist, Evie Adlemen whom she was to see every two weeks. When Ms. Adlemen called Ms. Mayo about the missed appointment, Ms. Mayo sounded "foggy" and said that amount of medication she had taken the night before for her pain caused her to oversleep. A child psychologist in the community refused to see Ms. Mayo because of her numerous missed appointments and cancellations. Ms. Mayo's arthritis physician, who must see her every three months to refill her prescriptions, refused to refill her medications because of the number of times she has cancelled or missed appointments.

{¶14} FCCPS presented evidence that the Agency become involved in April 2010 concerning a State Highway Patrol report where Ms. Mayo was found driving with the children in her vehicle and appeared to be under the influence of a substance. At the outset of the case, she was unable to identify what medications she was taking or why she was taking them. Ms. Mayo "had little recollection of how she was actually acting at [the] time" of the girls' removal, but did recall that her brother told her that she was acting like a "space cadet." During her psychological evaluation, she was unable to identify the first president of the United States, though she was readily able to do so during her trial. On several occasions, she was observed with dry mouth, her mouth hanging down to the side, or having difficulties with comprehension. Occasions where she appeared to be under the influence of a substance continued through 2011. (In May 2011, Ms. Mayo was observed slurring her speech and appeared not to be her "normal self."

{¶15} Between December 2011 and the January 2012, Ms. Mayo became confused and disoriented on her way to a Zanesville, Ohio appointment for J.M. at the Agency. Ms. Mayo had been to the Zanesville facility at least ten times before. Despite this, she had trouble driving to the facility, and trouble describing her current location when she contacted the Agency for directions. Although Ms. Mayo's grasp on what medications she took had improved by January 2012, she continued to miss appointments, and at times seemed unsure of what physicians she was seeing and why she was seeing them.

{¶16} Concerns were also introduced concerning Ms. Mayo's mobility. The bedrooms in Ms. Mayo's home were on the second floor and the third floor was an attic. If the children were returned, their rooms would have been on the second floor of the house, and that the third floor would have become a play area for them. Ms. Mayo stated that she had no problems going up or down stairs. During her counseling sessions, Ms. Mayo said that her physical limitations restricted her from going upstairs to the second floor, which was why she "wasn't sure what it was like ... where the girls' bedrooms... were located."

{¶17} In an April 2011 home visit, she went upstairs on her hands and knees. Even during visits to the FCCPS, Ms. Mayo had "extreme difficulty" walking between the lobby and the visiting room, and used the Agency's wheelchair because of her pain. The staircase leading to the proposed play area for the children was "like a ladder with steps in between." Because they are steep, "tricky" and lack a railing the third floor stairs are more difficult to use than normal stairs.

{¶18} The girls needed constant supervision because J.M., K.M. and M.M. were special needs children. The girls needed constant supervisions, both inside and outside the home. Supervision inside the home was important because they have a history of abusive behavior amongst themselves. J.M. had been physically aggressive to her sisters, who have expressed fear of her. Although Ms. Mayo recognized the importance of being able to access the upstairs areas of her home, Ms. Mayo did not believe that she has any physical limitations that would have made her unable to provide adequate supervision for the children.

{¶19} Outside the home, Ms. Mayo's mobility was a concern because J.M. had a history of running away. Ms. Mayo, who did not have a plan to prevent J.M. from running away, testified that she would physically pursue in her car or scooter if J.M. ran away. Ms. Mayo had not been seen using the motorized scooter outside the home. Ms. Mayo kept the scooter in her home. The scooter was extremely heavy. Even two people could not carry the scooter out by hand, and a ramp was necessary to take the scooter out of the home. Ms. Mayo testified that she had a temporary ramp, but the Agency had not seen it. Ronda Brown, a good friend of Ms. Mayo's, had not seen the ramp either. Additionally, the children needed constant supervision outside the home because they could not have been left alone due to the risk of victimization. J.M. and K.M. were extremely vulnerable to victimization, and M.M. was also vulnerable to victimization.

{¶20} Pursuant to the request of the children's attorney, the court conducted an in-camera interview of the children on September 13, 2011. The children indicated that they wanted to go home to live with their mother, Paula Mayo. Additionally, J.M. testified that she has grown since being removed from Paula Mayo's home and would comply

with the rules of the house. J.M. further testified that she was nearing her seventeenth birthday and would return to Paula Mayo's home upon turning 18.

**{¶21}** Jody Ash and Miranda Zircher, the children's counselors, stated that Paula had made progress in recent months with her treatment goals. They also stated that there is a strong bond between Paula Mayo and the Children and that severing this bond would be detrimental to the children.

**{¶22}** Robin A. Rippeth, the psychologist who completed the Psychological Evaluation for Paula Mayo, testified that she recommended that the agency begin home-based therapy with the children and Ms. Mayo. FCCPS never followed the recommendation that in home visitation begin.

**{¶23}** Based upon the testimony the trial court found that "it is undisputed that there is a significant bond between Paula Mayo, J. M., K. M. and M. M."

**{¶24} B. the Trial Court's Decision.**

**{¶25}** The trial court upon reviewing the evidence made the following findings,

> Although currently, the exact cause of Paula Mayo's confusion is unknown, Paula Mayo still exhibits evidence of confusion which would significantly impact her ability to parent This aspect of the case plan has not been successfully completed, and is relevant to the Court.

> * * *

> Paula Mayo's mobility issues have a significant impact on her ability to supervise these children and are relevant to the Court the mobility issues, as a portion of Paula Mayo's health issues, have not been

resolved and Paula Mayo has not successfully complied with this aspect of the case plan.

* * *

In April 2010, upon the removal of the girls from Paula Mayo's home, the hygiene of the girls was extremely poor. Jasmine Mayo could not recall the last time she had bathed. Throughout the history of this case, Paula Mayo has exhibited times when her clothes are dirty and she has an odor of her body about her person. Given Paula Mayo's hygiene and/or mobility issues, it is going to be extremely difficult for her to maintain appropriate hygiene for the children. Paula Mayo has not successfully completed this aspect of the case plan and this hygiene issue is relevant to the Court.

* * *

Paula Mayo believes that she will qualify for a loan reduction program, but it has not yet been established that she will definitely obtain the loan reduction. Paula Mayo does have a stable source of income through her retirement plan. However, she has been behind on many of her bills, has not paid her mortgage since August 2011, has used check cashing companies on at least two occasions, and throughout the history of this case, has not paid any child support for the children. Paula Mayo has no explanation as to how her bills got so far behind. There is still a viable concern as to whether Paula Mayo can financially provide for

herself and the children, and therefore, this aspect of the Case plan has not been successfully completed and is relevant to the Court.

* * *

Paula Mayo has minimized her health and financial issues and has not consistently been forthcoming with information. In late 2011, Paula Mayo had a staph infection and did not report it Fairfield County Child Protective Services even though she visited her children at Fairfield County Child Protective Services. This failure to disclose potentially placed her children, Agency case workers and employees, and all other families who frequent Fairfield County Child Protective Services to be at risk to developing a staph infection. This failure to disclose her medical condition could be potentially dangerous if the children were returned to her care and is relevant to the Court.

* * *

Paula Mayo has not utilized this counseling service. Paula Mayo focuses on her hoarding behavior more than working on parenting issues. Paula Mayo has not been consistent in counseling, as there was a period of approximately two (2) months where Paula Mayo did not attend any counseling sessions. Paula Mayo has a simplistic view of this case that if the house is clean, the children can return. Paula Mayo stated that the focus of her counseling shifted to parenting issues during her most recent appointment with Dr. Adelman, which occurred one (1) week prior to the January 31, 2012 trial. It is a major concern that Paula Mayo has been

seeing Dr. Adelman for almost one (1) year, yet the main focus of the counseling only recently became parenting issues. It is also concerning that Paula Mayo does not recognize all of the limitations of the children and represents in counseling that the girls are higher functioning than is truly the case.

* * *

Through Fairfield County Child Protective Services' facilitation, Paula Mayo has also had the opportunity to engage in counseling with the mental health counselors for J.M., K.M. and M.M. With respect to J.M.'s counselor, Paula Mayo has not utilized this resource. Paula Mayo has attended four (4) counseling sessions and has missed four (4) counseling sessions. It is therapeutically recommended for J.M. that J.M. be living in an intensely supervised and structured environment with a caregiver who has a clear understanding of the special needs of J.M. J.M. has oppositional behaviors, has threatened suicide, has significant sexualized behavior, has sexual identity issues, and is extremely vulnerable for abuse. Paula Mayo does not have the appropriate insight to the severity of jasmine Mayo's mental health and safety issues, and Paula Mayo minimizes these issues. Paula Mayo minimizes her role in the removal of J.M. from the home by stating that things would be different if J.M. came home, as J.M. "has learned her lesson." Paula Mayo has not formulated a realistic plan to deal with J.M.'s behavior. J.M. has been described as "a ticking time bomb," yet Paula Mayo's plan to deal with J.M.'s behaviors is

simply to watch her or that J.M. just will not behave that way if returned to Paula Mayo.

K.M. has multiple handicaps and will require lifetime care. K.M. has physical issues which require her to wear adult diapers. These physical issues create hygiene issues, as well, as K.M. often requires assistance to keep herself clean. K.M. has major cognitive issues to the point where it is difficult for K.M. to form words. K.M. is easily overwhelmed and is extremely vulnerable to victimization. K.M. has limited social skills and requires a structured environment with one-on-one attention and guidance. Paula Mayo minimizes K.M.'s issues by stating that K.M. does not present a challenge from a parenting perspective. Paula Mayo also minimizes K.M.'s physical issues by saying that K.M. did not wear adult diapers when she lived with Paula Mayo and Paula Mayo does not expect K.M. to continue to wear adult diapers if returned to Paula Mayo.

M.M. does not yet have all the behavior or cognitive issues that her older sisters' possess, however, M.M. is starting to exhibit basic cognitive limitations and defiant behavior. Although it cannot yet be determined, all indications are that M.M. is developing some of the issues of her older sisters. M.M. has been described as loyal to her sisters and Paula Mayo, and at times has assumed the parental role with her sisters and Paula Mayo. It is a major concern that if Paula Mayo cannot acknowledge and understand the existing conditions of J.M. and K.M., then she will not be able to recognize the developing conditions of M.M. This minimizing

behavior of Paula Mayo concerning all of the children is relevant to the Court.

* * *

The psychological evaluation of Paula Mayo indicates that she has a simplistic plan for supervision of the children. The psychological evaluation questions Paula Mayo's understanding of the need for supervision of the children. The psychological evaluation indicates that Paula Mayo does not fully grasp the vulnerability of the children and the evaluation indicates that Paula Mayo is dependent on others to fulfill her own needs. The information contained in the psychological evaluation is relevant to the Court.

It is undisputed that there is a significant bond between Paula Mayo, J.M., K.M. and/or M.M. These children have suffered much loss throughout their life and Paula Mayo has been their only source of family support. FCCPS will maintain the relationship between Paula Mayo and the children as long as it is practical, healthy and available to do so.

{¶26} In the case sub judice, the trial court further found, pursuant to R.C. 2151. 414(B)(1)(d) that the children had been in the temporary custody of the agency for a period of time in excess of twelve of the prior twenty-two consecutive months.

{¶27} On March 23, 2012, the trial court filed Findings of Fact and Judgment Entries in each child's case, which placed J.M. in a planned permanent living arrangement with the agency and which terminated her parental rights with respect to his

minor children M.M. and K.M. and granted permanent custody of the children to appellee, FCCPS.

{¶28}  It is from these entries that the adoptive-mother Paula Mayo and the minor children, J.M., K.M. and M.M. have appealed.

**II. Assignments of Error**

{¶29}  On appeal, the Children assert the following assignments of error,

{¶30}  "I. THE STATE FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT IT WAS IN THE BEST INTEREST OF THE MINOR CHILDREN TO GRANT PERMANENT CUSTODY TO THE FAIRFIELD COUNTY CHILD PROTECTIVE SERVICES AGENCY AS REQUIRED BY OHIO REVISED CODE SECTION 2151.414.

{¶31}  "II. THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO THE AGENCY WHERE THE EVIDENCE CLEARLY INDICATED THAT THERE HAD BEEN INSUFFICIENT EFFORTS TOWARDS REUNIFICATION. AS REQUIRED BY OHIO REVISED CODE SECTION 2151.414.

{¶32}  "III. THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO THE AGENCY WHERE IT WAS MANIFEST THAT THE PARENT WAS MAKING SUBSTANTIAL PROGRESS TOWARDS REUNIFICATION AS REQUIRED BY OHIO REVISED CODE SECTION 2151.414.

{¶33}  "IV. THE TRIAL COURT ERRED IN FAILING TO CONSIDER THE PSYCHOLOGICAL EFFECTS OF PERMANENT CUSTODY ON THE MINOR CHILDREN."

**A. Burden Of Proof**

**{¶34}** "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169(1990), *quoting Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551(1972). A parent's interest in the care, custody and management of his or her child is "fundamental." Id.; *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599(1982). The permanent termination of a parent's rights has been described as, "* * * the family law equivalent to the death penalty in a criminal case." *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45(6th Dist.1991). Therefore, parents "must be afforded every procedural and substantive protection the law allows." Id.

**{¶35}** An award of permanent custody must be based upon clear and convincing evidence, R.C. 2151.414(B)(1). The Ohio Supreme Court has defined "clear and convincing evidence" as "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 103-104, 495 N.E.2d 23(1986).

**B. Standard of Review**

**{¶36}** The Ohio Supreme Court has delineated our standard of review as follows,

> Where the degree of proof required to sustain an issue must be
> clear and convincing, a reviewing court will examine the record to

determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof. See *Ford v. Osborne*, 45 Ohio St. 1, 12 N.E. 526, *Cole v. McClure*, 88 Ohio St. 1, 102 N.E. 264, and *Frate v. Rimenik,* 115 Ohio St. 11, 152 N.E. 14.

*Cross v. Ledford,* 161 Ohio St. 469, 477, 120 N.E. 2d 118 (1954). A court of appeals will affirm the trial court's findings "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." *In re Adkins,* 5th Dist. Nos. 2005AP06–0044 and 2005AP07–0049, 2006-Ohio-431, 2006 WL 242557, ¶17.

**{¶37}** In *Cross*, the Supreme Court further cautioned,

The mere number of witnesses, who may support a claim of one or the other of the parties to an action, is not to be taken as a basis for resolving disputed facts. The degree of proof required is determined by the impression which the testimony of the witnesses makes upon the trier of facts, and the character of the testimony itself. Credibility, intelligence, freedom from bias or prejudice, opportunity to be informed, the disposition to tell the truth or otherwise, and the probability or improbability of the statements made, are all tests of testimonial value. *Where the evidence is in conflict, the trier of facts may determine what should be accepted as the truth and what should be rejected as false*. See *Rice v. City of Cleveland*, 114 Ohio St. 299, 58 N.E.2d 768.

161 Ohio St. at 477-478. (Emphasis added).

**{¶38}  III. Requirements for Permanent Custody Awards**

**{¶39}** R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

**{¶40}** Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.;

(b) The child is abandoned;

(c) The child is orphaned and there are no relatives of the child who are able to take permanent custody; or

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

**{¶41}** Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

**{¶42} A. Reasonable Efforts to Prevent the Removal of the Child from the Child's Home.**

**{¶43}** In the case judice, FCCPS filed its Motion for Permanent Custody pursuant to R.C. 2151.414. Pursuant to R.C. 2151.419, the agency that removed the child from the home must have made reasonable efforts to prevent the removal of the child from the child's home, eliminate the continued removal of the child from the home,

or make it possible for the child to return home safely. The statute assigns the burden of proof to the agency to demonstrate it has made reasonable efforts.

**{¶44}** However, R.C. 2151.419 does not apply in a hearing on a motion for permanent custody filed pursuant to R.C. 2151.413 and 2151.414. *In re C.F.*, 113 Ohio St.3d 73, 81, 2007–Ohio–1104, 862 N.E.2d 816, (Citation omitted). Therefore, the trial court was not required to make a specific finding that FCCPS had made reasonable efforts to reunify the family. In *In re C.F.*, supra, the court also stated that this does not mean that the agency is relieved of the duty to make reasonable efforts,

> At various stages of the child-custody proceeding, the agency may be required under other statutes to prove that it has made reasonable efforts toward family reunification. To the extent that the trial court relies on 2151.414(E)(1) at a permanent custody hearing, the court must examine the reasonable case planning and diligent efforts by the agency to assist the parents' when considering whether the child cannot and should not be placed with the parent within a reasonable time.

Id. at paragraph 42.

**{¶45}** R.C. 2151.414.(E)(1) requires proof that the FCCPS engaged in reasonable case planning and made "diligent" efforts to assist the parents in remedying the problems that caused the removal of the children.

**{¶46}** FCCPS filed its request for permanent custody pursuant to R.C. 2151.414. A review of the record indicates at multiple review hearings, the Court found FCCPS utilized reasonable efforts to reunify the family. Therefore, the showing of reasonable efforts was not required to be proven by the state or found by the Court during the

permanent custody hearing. *In re J.J.F.,* 5th Dist. No. 2009-CA-00133, 2009-Ohio-4736, ¶26.

**{¶47}** One particular section, R.C. 2151.414(E)(1), does require the court to examine the "reasonable case planning and diligent efforts by the agency to assist the parents" when determining whether a child should not or could not be returned to a parent within a reasonable time. This requirement and examination should not be confused with the reasonable efforts requirement as set forth by R.C. 2151.419 as requiring the trial court to determine reasonable efforts at every permanent custody motion brought under R .C. 2151.413 or 2151.414.

**{¶48}** We find that the evidence established that FCCPS did provide services designed to alleviate the problem that led to the children's removal and did make diligent efforts to assist Mayo in remedying the problem.

**{¶49} B.   Parental Placement within a Reasonable Time- R.C. 2151.414(B) (1) (a).**

**{¶50}** The court must consider all relevant evidence before determining the child cannot be placed with either parent within a reasonable time or should not be placed with the parents. R.C. 2151.414(E). The statute also indicates that if the court makes a finding under R.C. 2151.414(E) (1) – (15), the court shall determine the children cannot or should not be placed with the parent. A trial court may base its decision that a child cannot be placed with a parent within a reasonable time or should not be placed with a parent upon the existence of any one of the R.C. 2151.414(E) factors. The existence of one factor alone will support a finding that the child cannot be placed with the parent within a reasonable time. See *In re: William S.,* 75 Ohio St.3d 95, 1996-Ohio-182, 661

N.E.2d 738; *In re: Hurlow,* 4th Dist. No. 98 CA 6, 1998 WL 655414(Sept. 21, 1998); *In re: Butcher*, 4th Dist. No. 1470, 1991 WL 62145(Apr 10, 1991); *In re: B.B.*, 5th Dist. No. 2010CA00151, 2010-Ohio-4618, ¶24.

**{¶51}** R.C. 2151.414(E) sets forth factors a trial court is to consider in determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Specifically, Section (E) provides, in pertinent part, as follows:

(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to

be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

(3) The parent committed any abuse as described in section 2151.031 of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03 of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody;

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child

when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

(5) The parent is incarcerated for an offense committed against the child or a sibling of the child;

(6) The parent has been convicted of or pleaded guilty to an offense under division (A) or (C) of section 2919.22 or under section 2903.16, 2903.21, 2903.34, 2905.01, 2905.02, 2905.03, 2905.04, 2905.052907.07, 2907.08, 2907.09, 2907.12, 2907.21,2907.22, 2907.23, 2907.252907.31, 2907.32, 2907.321, 2907.322, 2907.323, 2911.01, 2911.02, 2911.11, 2911.12,2919.12, 2919.24, 2919.25, 2923.12, 2923.13, 2923.161, 2925.02, or 3716.11 of the Revised Code and the child or a sibling of the child was a victim of the offense or the parent has been convicted of or pleaded guilty to an offense under section 2903.04 of the Revised Code, a sibling of the child was the victim of the offense, and the parent who committed the offense poses an ongoing danger to the child or a sibling of the child.

(7) The parent has been convicted of or pleaded guilty to one of the following:

* * *

(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of

the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

(10) The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

(12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.

(13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child.

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

(15) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.

(16) Any other factor the court considers relevant.

**{¶52}** In this case, the trial court made its permanent custody findings pursuant to R.C. 2151.414(E)(1), (4) and/or (16). The trial court further found that J.M. could not be placed with adoptive-mother within a reasonable time or should not be placed with her and that, due to J.M.'s age and J.M.'s desire not to be adopted, placement in a planned permanent living arrangement would be in her best interest. J.M. was seventeen years old.

**{¶53}** As set forth above, the trial court's findings are based upon competent credible evidence. The record includes the recommendation of the Guardian ad Litem for the children, and the testimony of several witnesses at trial. The trial court was in the best position to determine the credibility of the witnesses.

{¶54} The children love Ms. Mayo and Ms. Mayo loves her children and has developed a bond. The evidence demonstrated the successful efforts the adoptive mother had made in the case to regain custody of her children. On that point, the evidence demonstrates that any improvement that Ms. Mayo has made in her life is tentative and, perhaps, temporary, and that she is at risk of relapse. The trial court found that, regardless of Ms. Mayo's compliance with aspects of his case plan, she was still not able to be a successful parent to her special needs children.

{¶55} In the case of *In re: Summerfield*, 5th Dist. No. 2005CA00139, 2005-Ohio-5523, this court found where, despite marginal compliance with some aspects of the case plan, the exact problems that led to the initial removal remained in existence, a court does not err in finding the child cannot be placed with the parent within a reasonable time.

{¶56} Based upon the foregoing, as well as the entire record in this case, the Court properly found the children could not or should not be returned to the adoptive mother within a reasonable time. Despite offering numerous services, the adoptive mother was unable to mitigate the concerns that led to the children's removal.

**B. The Best Interest of the Children.**

{¶57} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with

due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.

**{¶58}** The focus of the "best interest" determination is upon the child, not the parent, as R.C. 2151.414(C) specifically prohibits the court from considering the effect a grant of permanent custody would have upon the parents. *In re: Awkal*, 95 Ohio App.3d 309, 315, 642 N.E.2d 424(8th Dist. 1994). A finding that it is in the best interest of a child to terminate the parental rights of one parent is not dependent upon the court making a similar finding with respect to the other parent. The trial court would necessarily make a separate determination concerning the best interest of the child with respect to the rights of the mother and the rights of the father.

**{¶59}** The trial court made findings of fact regarding the children's best interest. It is well-established that "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re: Mauzy Children,* 5th Dist. 2000CA00244, 2000 WL 1700073(Nov. 13, 2000), quoting *In re Awkal*, 95 Ohio App.3d 309, 316, 642 N.E.2d 424(8th Dist. 1994).

**{¶60}** As an appellate court, we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. *Cross Truck v. Jeffries,* 5th Dist. No. CA-5758, 1981 WL 6321(Feb. 10, 1982). Reviewing courts should accord deference to the trial court's decision because the trial court has had the

opportunity to observe the witnesses' demeanor, gestures, and voice inflections that cannot be conveyed to us through the written record, *Miller v. Miller* (1988), 37 Ohio St. 3d 71, 523 N.E.2d 846.

{¶61}   In the present case, the trial court's decision indicates it considered the best interest factors. Upon review of the record, it is clear that the record supports the trial court's finding that granting the motion for permanent custody is in the children's best interest. The trial court concluded the children's need for legally secure placement could not be achieved without awarding permanent custody to FCCPS.

{¶62}   The record makes clear that appellant failed to complete the majority of the case plan provided by FCCPS. The psychological evaluation indicates that Paula Mayo does not fully grasp the vulnerability of the children and the evaluation indicates that Paula Mayo is dependent on others to fulfill her own needs. Paula Mayo was provided an opportunity to attend counseling to improve her parenting skills. However, she has not utilized this resource. Paula Mayo has attended four (4) counseling sessions and has missed four (4) counseling sessions.

{¶63}   It is therapeutically recommended for J.M. that J.M. be living in an intensely supervised and structured environment with a caregiver who has a clear understanding of the special needs of J.M. Paula Mayo minimizes K.M.'s issues by stating that K.M. does not present a challenge from a parenting perspective. Paula Mayo also minimizes K.M.'s physical issues. If Paula Mayo cannot acknowledge and understand the existing conditions of J.M. and K. M. then she will not be able to recognize the developing conditions of M. M.

**{¶64}** The record contains competent, credible evidence that J.M. was initially placed in foster care with her sisters, but has been moved ten times. She was removed from the same care as K.M. and M.M. because she has been physically aggressive towards them and to smaller children. K.M. and M.M. expressed fear of J.M. (T. Jan. 31, 2012 at 188). Presently, J.M. is with a therapeutic foster family who has done a "really good job of...keeping her safe." (Id. at 190). K.M. and M.M. appear very close and get along well with their foster family. (Id. at 193). No other family members are available to care for any of the children. (Id. at 196-197). In spite of the deep bond between the children and Ms. Mayo, it is in the best interest of the children to be placed with FCCPS. (Id. at 198-199; 201-202).

**{¶65}** "A trial court is not required to specifically enumerate each factor under R.C. 2151.414(D) in its decision. However, there must be some indication on the record that all of the necessary factors were considered." (Citations omitted.) *In re C.C.,* 10th Dist. No. 04AP–883, 2005–Ohio–5163, ¶ 53.

**{¶66}** Upon a careful review of the trial court's journal entry and the record of this case we find that the trial court took into account the interaction and interrelationship of J.M., K.M. and M.M. Further the trial court addressed the interaction and interrelationship between the adoptive mother and the children.

**{¶67}** Clear and convincing evidence supported the trial court's decision finding that it was in children's best interests to FCCPS' motion for permanent custody.

**III. Conclusion**

**{¶68}** For these reasons, we find that the trial court's determination that the adoptive mother had failed to remedy the issues that caused the initial removal and

therefore the child could not be placed with her within a reasonable time or should not be placed with her was based upon competent, credible evidence and is not against the manifest weight or sufficiency of the evidence. We further find that FCCPS engaged in reasonable case planning and made "diligent" efforts to assist the adoptive mother in remedying the problems that caused the removal of the children.

{¶69} The trial court took into account the interaction and interrelationship of J.M., K.M. and M.M. Further the trial court addressed the interaction and interrelationship between adoptive mother and the children. Despite some compliance with some aspects of the case plan, the exact problems that led to the initial removal remained in existence.

{¶70} We further find that the trial court's decision that permanent custody to FCCPS was in the child's best interest was based upon competent, credible evidence and is not against the manifest weight or sufficiency of the evidence.

{¶71} Because clear and convincing evidence in the record supports the trial court's judgment, we overrule the children's four assignments of error.

{¶72} J.M., K.M. and M.M.'s four assignments of error are overruled in their entirety, and the judgment of the Fairfield County Court of Common Pleas, Juvenile Court Division is affirmed.

By Gwin, P.J.,

Hoffman, J., and

Wise, J., concur

_____

HON. W. SCOTT GWIN

_____

HON. WILLIAM B. HOFFMAN

_____

HON. JOHN W. WISE

WSG:clw 0925

[Cite as *In re J.M.*, 2012-Ohio-4705.]

IN THE COURT OF APPEALS FOR FAIRFIELD COUNTY, OHIO

FIFTH APPELLATE DISTRICT

IN RE: J.M., K.M., M.M.          :
:
:
:
:
:
:        JUDGMENT ENTRY
:
:
:
:        CASE NO. 2012-CA-23

For the reasons stated in our accompanying Memorandum-Opinion, we overrule the Children four assignments of error, and affirm the judgment of the Fairfield County Court of Common Pleas, Juvenile Court Division. Costs to appellant.

_____
HON. W. SCOTT GWIN

_____
HON. WILLIAM B. HOFFMAN

_____
HON. JOHN W. WISE